02-11-485-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00485-CV

 

 


 
 
 In the Interest of L.L.F., T.L.F., K.D.B., II,
 A.A.H., and N.C.H., Children
 
 
  
 
 
  
 
 
 
 
  
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

 

----------

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I. 
Introduction

Appellant
L.J. (Mother) appeals the trial court’s judgment terminating her parental
rights to her five children.  After a bench trial, the trial court found that
Mother had engaged in conduct or knowingly placed the children with persons who
had engaged in conduct that endangered the physical or emotional well-being of
the children and had knowingly placed or knowingly allowed the children to
remain in conditions or surroundings that endangered their physical or
emotional well-being.[2]  The trial court also
found that Mother has a mental or emotional illness or mental deficiency that
renders her unable to provide for the children’s needs and that the illness or
deficiency would in all reasonable probability continue to render Mother unable
to provide for the children through their eighteenth birthdays.[3]
 In addition, the trial court found that termination of Mother’s parental
rights would be in the children’s best interest.  Mother challenges the legal
and factual sufficiency of the evidence in four issues.  We affirm.

II. 
Background

Mother
has five children.  At the time of trial in March 2011, L.L.F. was nine years
old, T.L.F. was six years old, K.D.B. was five years old, A.A.H. was three
years old, and N.C.H. was seventeen months old.

In
August 2007, the Texas Department of Family and Protective Services (the
Department) received a referral that Mother had been hospitalized after
attempting to overdose on medication.  Department investigator Brandy Matthews
testified that Mother “had asked her oldest child to stab her in the stomach[,]
and she was currently pregnant at the time.”  Mother told Matthews that she had
taken some pills, had a knife, and had thought about stabbing herself with it,
but Mother denied having asked L.L.F. to stab her.  Mother also told Matthews
that she had smoked marijuana three weeks earlier.

Matthews
testified that L.L.F., T.L.F., and K.D.B. lived with Mother at the time of the
suicide attempt.  L.L.F., who was five years old at the time, told Matthews that
she had seen Mother take two pills, that Mother had asked her to stab her, but
that she had refused.  The three children were removed and placed into foster
care.  A.A.H. was born in January 2008 but was not removed from Mother because
the Department did not believe she was in danger since Mother was receiving
services from the Department at the time.

Takeisha
Lusk-Wilkerson served as Mother’s caseworker for the 2007 referral.  Mother’s
service plan included parenting classes and random drug testing, and mental
health services provided by Tarrant County Mental Health/Mental Retardation
(MHMR).  Mother also submitted to a psychological evaluation.  She was
diagnosed as bipolar and as having a personality disorder.  Mother participated
in services through MHMR, mostly for medication management, and started taking
medication after A.A.H.’s birth.  Although she was in jail for three weeks in
February 2008 for a bond violation relating to a previous arrest, Mother was,
as of April 2008, generally doing well.  She was taking psychotropic
medication, avoiding aggressive and violent behaviors, and stable.

Gladys
Demus took over as Mother’s caseworker in May 2008.  She testified that her
main goals for Mother were for her to take her medication and to not lose her
social security income.  Mother’s social security benefits were cut off in July
2008 because of a warrant for her arrest, and they were not reinstated until
October 2008.  Also in July 2008, the Department received a new referral that
was called in by one of Mother’s neighbors.  Mother told Demus that she had
ended a relationship with her neighbor’s eighteen- or nineteen-year-old son,
which led to a disagreement with the neighbor, and the neighbor made
allegations about Mother to the Department.  Mother also told Demus that she
had stopped taking her medication “because it made her feel funny.”  Demus
testified that when she spoke to Mother, Mother was struggling to complete her
services and seemed to be getting overwhelmed.  Demus testified that she was concerned
about Mother’s temper, saying that Mother was very nice and calm one moment but
loud and uncontrollable another.  Mother promised to resume taking her
medication but did not do so, later saying that she did not need her medication.

In
February 2009, the Department decided to begin a monitored return of the
children to Mother, and the children began weekend visitations with Mother.  Mother’s
case was also transferred to the Department’s Strengthening Families Unit, and
Schauntae Kato became Mother’s caseworker.  Kato described the Strengthening
Families Unit as an intense program designed to work with families who are at
risk for neglect of their children.

Kato
testified that Mother told her that she was not taking her medication because
it made her tired and unable to respond to her children the way she wanted.  Mother
also told Kato that she was pregnant again.  Mother said she felt overwhelmed,
and she reported that the children were not listening to her and that they were
not on a regular schedule for meals, bedtime, or daycare.  Kato offered Mother
continued counseling and parenting classes.  Kato also arranged for the
Department to pay Mother’s rent in March 2009.

Kato
testified that Mother still did not have food stamps or Medicaid in February 2009,
even though eighteen months had passed since the children were initially
removed.  The children, however, had Medicaid coverage through the Department.  Mother
began receiving her own Medicaid benefits in May 2009.

Kato
testified that the children were doing “okay” in March 2009.  They had been
through quite a transition from having been away from home and then returning
to Mother, and they were having some behavioral problems.  L.L.F., the oldest
child, was attending a school within walking distance of Mother’s apartment.  Kato
testified that the children were properly clothed and did not appear
malnourished, and she said that Mother used money from the Department to purchase
furniture for the children.

Christy
Stewart was Mother’s Catholic Charities caseworker beginning in April 2009.  Mother
admitted to Stewart that she was not seeing a doctor or taking her bipolar
medication, and she told Stewart that she was hearing voices and had to fight
them off.  Mother also told Stewart on April 8 about domestic violence in her
relationship with D.H.,[4] and she said that she had
been putting bleach in D.H.’s food, not to kill him but to make him sick.  D.H.
told Stewart that the bleach allegation was “ridiculous,” but Stewart contacted
the Department because of what Mother had told her.

Kato
testified that the children were removed from Mother for one or two nights
following the report concerning the bleach.  After considering the situation,
including that Mother had recently been set up to begin MHMR services, the
Department returned the children to Mother.  Kato testified that she believed
the April 2009 decision to not permanently remove the children was risky
because Mother was not yet taking medication and was exhibiting concerning
behavior.  However, none of Mother’s behavior was directed at the children, and
D.H. did not believe the bleach allegation to be true.

After
the children were returned to Mother, Mother told Kato that L.L.F. had written
a note to a boy at school, asking if they could have sex when they grew up.  Kato
interviewed L.L.F., but L.L.F. did not make any sexual abuse outcry.

Kato
also testified about other difficulties for Mother after the children were
returned to her in April 2009.  Mother would not go to the county hospital for
medications.  Kato spoke with Sharon Fountain of MHMR on May 27, 2009, and the
hope was for MHMR to deal with Mother’s mental health issues by providing
employment assistance, community support, clinical support, medication
management, and respite care.  But Mother had difficulty with MHMR appointments,
such as acting out and not understanding when additional information was
required, so Kato personally took Mother to MHMR.  Kato testified that MHMR
accepted Mother as a client, but only after Kato had salvaged the situation.  Also,
Mother’s request for public housing was denied on June 1 because of her
criminal history.  Even so, the court renamed Mother the children’s permanent
managing conservator in June 2009, and Mother resumed taking her MHMR
medications in July.  Kato testified that Mother’s case was closed in October
2009, but Kato also testified that she had ongoing concerns with Mother’s
medication because Mother had again stopped taking it due to her pregnancy.  However,
Kato acknowledged that Mother was better than she had been at the time of the
2007 referral.

Suzanne
Gorry started working with Mother after N.C.H. was born in October 2009.  Gorry
works for the Department in its Family-Based Safety Services Unit, which
monitors and provides continuing services for families.  The Department
initiated the continuing services because Mother tested positive for marijuana
four times during her pregnancy with N.C.H.  When services began, all five of
Mother’s children were living with Mother.

Gorry
testified that Mother’s primary issue was mental health, but Gorry also said that
she had concerns about Mother’s substance abuse and parenting skills.  Gorry
knew Mother’s history from reviewing the case file and felt that Mother was not
applying what she should have learned from previous services.

In
December 2009 and January 2010, the Department gave Mother $400 to pay rent for
a new apartment because she had received an eviction notice.  Mother, D.H., and
the children were living in the apartment.  They were receiving about $700 per
month in social security income and food stamps.  Mother told Gorry that she
and D.H. had a verbal agreement with the previous apartment manager to receive
six months of free rent because of a bug infestation in their apartment, but
Gorry testified that the new apartment manager did not know anything about a
verbal agreement.  By mid-December 2009, Mother blamed Gorry for not finding a
new apartment for the family.  Gorry also testified that on January 12, 2010,
Mother and D.H. were waiting for her at her office, saying they needed the rent
money.  Mother became upset because Gorry did not have it.  Gorry testified
that Mother had to be escorted from the lobby because she was angry and
yelling.  Gorry acknowledged, however, that losing an apartment can be
upsetting but said that Mother’s conduct was not appropriate because, in her
opinion, Mother should not yell at the person trying to help her.

Gorry
testified that Mother was not participating in MHMR services.  Mother said she
could not make her appointments, but Gorry testified that she had set it up so
that the worker would go to Mother’s house.  Mother also told Gorry that she
was not taking her medication.  Gorry testified that she did not believe that
Mother was taking medications at any time between December 2009 and April 2010.

On
January 22, 2010, Mother called Gorry and said that D.H. had left her and the
children.  Mother was very upset and crying, and she later told Gorry that
there had been domestic violence between her and D.H.  However, Gorry testified
that D.H. had returned home by the next week.

In
late-January, Mother was not at home when Gorry arrived to take her to a psychological
evaluation.  D.H. and Gorry made phone calls to try to find Mother, but they
did not locate her.[5]  D.H. told Gorry that he
had lost his job because he had been having to stay home to care for the
children.  D.H. also told Gorry that Mother was not home a lot, that she went
out at night and would not come back, that he did not know what to do about
Mother, that he did not think she would get the help she needs, and that she
was not staying off of drugs.[6]  D.H. said that he did
not know how much longer he could put up with Mother and that things were not
getting better.[7]  He told Gorry that
Mother said she did not need medication.

By
the end of February, Mother’s in-home parenting services were discontinued
because Mother had several no-shows.  On March 5, Gorry had a telephone
conversation with Mother during which Mother was yelling and cursing at someone
else.  Mother said that she was applying for a job at the apartment complex
from which she had previously been evicted, that the manager told her to get
off the phone, and that Mother became angry and yelled profanities about the
manager.  Gorry testified that L.L.F. was at the apartment complex with Mother
during the incident.

Gorry
testified that the Department increased the “severity level” of Mother’s case
on March 16, 2010.  Mother had reported that D.H. had moved out and would not
return, and the Department had received a new referral alleging that drugs were
being sold from the home and that the children were being left alone while
Mother used drugs.  Mother told Gorry that she thought the referral came in
because a woman had stolen movies from her and because she had gone to the
woman’s house and “busted up everything.”

Gorry
met with Mother the next day, and she testified that Mother’s behavior was concerning.
 Mother reported having really big mood swings and said she wanted to call her
MHMR worker to possibly take her medications again.  Despite the drug
allegation, Gorry testified that she had not seen Mother using or possessing
drugs and agreed that the drug use allegations were all based on third-party
reports.  Even so, the Department staffed the case for a possible removal of
the children.

Gorry
testified that, on March 24, 2010, Mother’s apartment had “dirty diapers,
ashtrays on the floor, trash, [and] clothing everywhere.”  She testified that
Mother’s apartment was always cluttered and dirty.  Department investigator
Melinda Esquibel was also present on March 24, and she described the condition
of Mother’s apartment as follows:

There
was -- when you went into the living room, there was a lot of blankets and
clothing and just a bunch of various items all over the floors.  Very, very
cluttered.  And, I mean, you could not walk through the living room without
walking on something in there.  There was some clothing laying all over the
sofa and the chairs.  The kitchen table was full of dishes and foods.  In the
bedrooms, there was one bedroom you couldn’t even go in because it was so
cluttered with clothing and furniture and toys.

In
the children’s room, there was also trash on the floor, clothing, open empty
containers -- peroxide -- and the restroom was cluttered with various items,
too.

Esquibel
also testified that a Mr. D., who was living with Mother and the children,
admitted using marijuana and that Mother requested that he leave the home.  Esquibel
testified that the condition of Mother’s home was the theme of her
investigation but that she also had concerns about Mother’s mental health
issues.  She said that during the March 24 visit, Mother went from “really nice
and friendly, talking” to crying and that several times she moved her arm as if
she would hit Gorry.  Mother told Esquibel that she was not taking bipolar medication.

Esquibel
also spoke with D.H., who told her that Mother “was a time bomb waiting to go
off,” that Mother was “oblivious to reality,” and that he was concerned about
Mother not taking her medication.  D.H. said that Mother would call or text him
just to start arguments.  D.H. told Esquibel that he was concerned for the
safety of his children and that he supported whatever decision the Department made
to keep them safe.

Gorry
also visited Mother’s apartment on March 31.  Mother, Mr. D., T.L.F., K.D.B.,
and N.C.H. were present, and the condition of the apartment was a “slight
improvement” from March 24.  The Department sought removal of the children on
April 1, and the trial court granted the Department’s request.

Gorry
talked with D.H. on April 2.  He said that Mother and Mr. D. were using
marijuana.  He also said that living with Mother was torture, like being at war,
and that she was “crazy.”  On April 5, Mother admitted to Gorry in a telephone
conversation that she had used marijuana during her pregnancy but only when she
was pregnant.  Because the children had been removed, Mother’s case was
assigned to a different caseworker, and Gorry was no longer involved.

Abigail
Flores served as Mother’s caseworker from approximately May 2010 through trial.
 Mother’s service plan required that she attend parenting classes and
individual counseling, submit to a drug assessment, maintain stable housing and
employment, and continue with her MHMR services.  Flores testified that Mother
had kept in touch with MHMR even though she had not always been compliant.  Flores
told Mother that she and the Department expected a higher level of MHMR participation
than before, and Mother said she would take medication and work her services.  Flores
testified that Mother took advantage of visitation opportunities in May 2010.

Mother
had a Medicaid card as of May 2010, but her Medicaid was terminated in June
2010 and later reinstated without a lapse in services.  By June 2010, Mother
had been dismissed from individual counseling by Catholic Charities but had
again started counseling with Positive Influences.[8]
 However, Stacia Alexander, the executive director of Positive Influences,
testified that Mother was subsequently discharged from Positive Influences
because of missed appointments.  Alexander also described an incident involving
Mother during one of her counseling appointments.  Alexander testified that she
intervened in one of Mother’s sessions after hearing elevated voices from
another office.  When Alexander arrived, Mother was agitated, upset, tearful,
and irritable.  Alexander agreed that clients become upset at times during
counseling but testified that Mother’s behavior was unusual.

Flores
testified that Mother had ended her relationship with Mr. D. by June 2010, but Mother
reported to Flores that she was still having financial stress.  Mother had also
been dropped from parenting classes by this time for non-attendance, and she
told Flores that she had not attended because she had a lot going on.

Flores
testified that Mother was trying to work her services in July 2010 but that her
progress was minimal.  Mother claimed that she could not reach Positive
Influences and that they were not returning her calls.  Flores testified that
Mother was compliant with MHMR other than medication management, attended her
psychological assessment, and consistently attended visitations with the
children.  Mother did not submit to a drug assessment.  Flores also testified
that Mother attended three of twelve parenting class sessions and between four
and six of twelve individual counseling sessions before being discharged for
non-attendance.  Mother had also not been employed, but Flores acknowledged
that her recommendation that the court terminate Mother’s parental rights would
not change if Mother had been employed.

In
September 2010, Mother told Flores that she was taking her medication.  However,
Mother lost her Medicaid again in October 2010, and it had not been reinstated
as of the time of trial.  Mother also told Flores about volatility within her
own family.  She was attacked by her brother on July 12, 2010, and August 30,
2010, and someone hit her with some keys on October 27, 2010.  Flores testified
that she saw an injury to Mother from one incident with her brother, and Flores
described the injury as a gash on the side of Mother’s neck, like a scratch,
that extended from the back of her neck to the front.  In November 2010, D.H.
told Flores that Mother was “crazy”; he said “she was out of there and that she
was a split personality and she flips.”

Flores
testified that Mother did well with the children at visitations and that Mother
loves them.  Flores said that it is hard to control the children because they
are kind of hyper, but Mother was attentive to the children, tried to redirect
them, and brought them food.  However, Mother became very upset in front of the
children during one visitation.  Flores testified that when Mother “gets upset,
she gets really, really upset[,] and it takes a lot to really calm her down. 
She raises her voice[,] and she cries a lot.”  Flores testified that when she
asked Mother if she was taking her medication, Mother answered, “What good
would it do?”

Flores
testified that Mother was incarcerated days before trial for missing a criminal
court date.  Mother had informed Flores of the charge a week or two earlier.  Mother
did not attend the court hearing because she was at a visitation with L.L.F.

Flores
said that Mother was initially arrested for impeding a peace officer by
standing between the officer and the suspect, and Mother gave Flores her
version of what had occurred.  Mother was at her parents’ third-floor
apartment, and they heard police activity on the bottom floor.  Her brother
went downstairs, and the police followed him back upstairs.  Mother said she
was trying to get her brother into the apartment to prevent him from going back
to prison when the police came through the door and pushed everyone down.  Flores
testified that it was concerning to her that Mother was being accused of
conduct consistent with an untreated bipolar condition.[9]

Flores
testified that, in her opinion, Mother cannot meet the minimal duties that
parents owe to their children and that termination of Mother’s parental rights
to the children is in the children’s best interest.  Flores testified that the
children need stability and do not need to be going back and forth between
Mother and foster care and that Mother cannot provide that stability.  Flores
testified that the Department had educated Mother and given her the tools
necessary to parent her children but that Mother still cannot provide the
children with stability.

Flores
testified that A.A.H. and N.C.H. are together in foster care and are doing well.
 She said that A.A.H. is “a handful,” a little active, and very strong-willed.  A.A.H.
is attending speech therapy and is doing really well in the foster home.  Flores
testified that N.C.H. is a “happy-go-lucky baby”; she has only cried once, and only
because she was sick.  Flores said that N.C.H. is kind of sickly and deals with
a lot of allergies and congestion, but she had tubes placed in her ears, which
has helped.  Flores also testified that the foster family is a potential
adoption placement for the two girls if Mother’s parental rights are
terminated.

Flores
also described T.L.F. and K.D.B.  They are together in a different foster home
because the Department could not find a foster home for all five children.  Flores
said that T.L.F. and K.D.B. are “pretty active kids[,] and they’re hard to
control when they’re together because they are active.”  She testified that
T.L.F. is doing really well and is very talkative; she gets in trouble at
school for talking, but not for any other reasons.  She is “really sweet,”
doing well in school, and is a dancer.  Flores testified that T.L.F. offered to
teach her “how to boogie.”  K.D.B. is attending counseling in a full-day
program and speech therapy, and he has improved a lot with his speech.  Flores
said that he “kind of sits back and he’s always fighting for attention because
he’s the only boy, but he’s also doing well.”  The children are all together at
visitations.

Flores
testified that all of the children other than N.C.H. attend counseling.  T.L.F.
is in counseling because “she sexually acts out where she will stand in front
of the mirror and touch herself,” because of the things she has reported
seeing, including people yelling, and because of the separation from home.  K.D.B.
is in counseling because of his separation from home.

Flores
testified that L.L.F. is in a residential treatment center (RTC), not a foster
home, because she had to be removed from three different foster placements
within a two-to-three month period.  L.L.F. was removed from the first placement
(with K.D.B. and T.L.F.) because she tried to control them and told them to do
things that would get them in trouble.  She also started hitting K.D.B. and
T.L.F. and had to be watched closely before she was moved to another foster
home.  She was moved to a third foster home because of her behavior; she hit
the foster parents’ children and “was dragging them down the hallway and she
ripped some curtains down from the wall and she was destroying property.”  L.L.F.
has been in the RTC since January 2011 and has stayed at the same level through
the time of trial.  Flores testified that A.A.H.’s and N.C.H.’s foster family
has stated a willingness to accept L.L.F. but that L.L.F. is not at a point
where she can be integrated into the home.

Flores
also testified that a home study of K.D.B.’s paternal grandmother was completed
just before trial, but Flores did not know the result.  If placement with
K.D.B.’s paternal grandmother is approved, K.D.B. would be placed there, and
T.L.F would go to the foster home where A.A.H. and N.C.H. live and where L.L.F.
might eventually live after discharge from the RTC.  Flores also described the
services available to adoptive parents, regardless of who those adoptive parents
may be.

D.H.
testified that he is the father of A.A.H. and N.C.H.[10]
 He testified that he did not believe Mother attempted suicide in 2007, but he
acknowledged learning at that time that Mother had emotional problems that
required treatment.  He testified that he saw Mother take her medication
between August 2007 and the time when the children were returned to her, but he
acknowledged seeing her mood swings.  D.H. testified that Mother had exhibited
these mood swings from 2007 to the present and said that he had seen Mother
“bust out emotionally” and cry “quite a lot.”  D.H. reiterated that he thinks
Mother took her medication when he was around, but he also acknowledged that,
looking back, he believes Mother was probably not taking her medication.  He
also recalled her talking about the side-effects of the medication, such as
headaches and vomiting.

D.H.
agreed that he had previously said living with Mother was like torture,
testifying that she always wanted to argue.  He also recalled his stated belief
that Mother and Mr. D. were using marijuana in her apartment, and he testified
that he smelled “stuff” in the house.  D.H. testified that Mother denied using
marijuana when he asked her about it, but he did not believe her.  D.H.
testified that he does not believe that Mother put bleach in his food.

D.H.
described Mother as follows:

[Mother] is a good
woman.  She just needs help.  She’s a good mother.  She does need help, constructive
help, and me being a father to those children, of all the children, you know, I
do the best I can as a father, but when you go through these changes of emotion
and mood swings and numerous of people [sic], [Department] workers know her
moods.  They read the papers. They know her history, you know.  I needed their
help.  They knew what was going on.  And one day, she’s 100 percent, you know,
working with me, and two hours later, it’s a totally different person.

 

She
just needs help.  She does need help.

D.H.
testified that he does not want his children, A.A.H. and N.C.H., to go through
the chaos and trouble that the older children have lived through with Mother.  He
testified that Mother is an appropriate parent but that it is not a good idea
for the court to return the children to her.

Mother
also testified.  She acknowledged having not finished her service plan and said
that she initially had transportation issues with Catholic Charities and had
asked for and received a transfer to a closer location.  She also admitted that
she later stopped going without excuse.  Mother testified that she attended the
majority of her visitations; that she has a good relationship with the
children; that they ran to her, told her they love her, and asked when they are
going home; and that during visitations, she and the children played together,
talked about their daily routines, and interacted a lot.  Mother testified that
she always brought the children food and that she had occasionally bought them
toys to take home.

Mother
testified that she was, at the time of trial, not currently taking her
medications because she ran out a month earlier and had been taking her
medication every three days so it would last until her Medicaid was reinstated.
 Mother testified that her Medicaid became effective the same day of her
testimony, and she said her previous Medicaid lapses were related to confusion
over whether she was getting Medicare through Social Security.  Mother denied
having told anyone that she was not taking her medication in the past, and she
testified that she had only “stretched” her medications for the last month
before trial.  She testified that the medication helps but that memory loss is
a side-effect.

Mother
testified that she receives $701 each month in social security income, and her
rent is $495 per month.[11]  She supports herself by
using money that she had saved from a tax refund, social security
reimbursements, and past employment.  Mother testified that she has lived in
the same one-bedroom apartment since August 2010 and that she had worked at
Dollar General for four months of seasonal employment and at a temporary
service job for a week.  She said she is looking for employment and has filled
out a lot of applications.  She also receives $165 in food stamps each month.

Mother
testified that she would rent a two-bedroom apartment if the children were
returned to her.  Rent for that apartment would be $595, and Mother agreed that
she would not have the money to pay for daycare for the children.  She
testified that she can work but not too much because it would affect her social
security eligibility.  She also testified that she has already purchased
furniture for the children.

Mother
denied needing governmental assistance to maintain stability; instead, she
testified that she wanted to take advantage of what was offered to her by the
Department.  Specifically concerning the Department’s rent payments on her
behalf, she testified that she did not need the money and wished she had not
asked Gorry for it because of how it had made her look in court.  Mother denied
yelling at Gorry about rent money but acknowledged being asked to leave for
being “a little bit too loud.”  Also, Mother said that she did not ask
Strengthening Families for money but was told there was money available to her
for furniture.

Mother
acknowledged that she became very emotional at a counseling session at Positive
Influences, but she testified that she was upset because someone told her she
would not get her children back since she had missed too many classes.  Mother
testified that she was not angry at the workers, that she was instead upset
about having her parental rights terminated, and that she was hyperventilating
and coughing.  She testified that she calmed down after Alexander explained the
court process to her.

Mother
lived with D.H. from early 2007 through February 2010, but she testified that
he was in and out of her house.  She denied putting bleach in D.H.’s food or
ever telling anyone that she had done so.  Mother denied having a violent
relationship with D.H. and testified that she disagreed with D.H.’s testimony
that living with her was torture.  She testified that D.H. is a good father but
that she has no plans to get back with him.

Mother
acknowledged having clothes all over her house, but she testified that the
children’s diapers were in the trash; trash could have been overflowing a
little, but she said her apartment was nothing like what other witnesses had
described.  Mother denied using marijuana or admitting to anyone that she had
used marijuana, saying that she last used marijuana in 2007 and that she had
never used marijuana while pregnant.  Mother denied ever hearing voices or
telling anyone that she had, and she also denied having attempted suicide in
2007.  Mother testified that she took one Tramadol but felt nauseous, so she
called an ambulance for herself.  She also called her mother to come watch the
children.

Mother
agreed that she had difficulties between August 2007 and June 2009, and she
described the difficulties as follows:

I had just lost my
job.  That’s how I ended up getting that aggravated assault thing, so I ended
up losing my job, I ended up losing my apartment, my mom ended up dying, and I
felt like, you know, I was like depressed, I was crying, I was feeling like,
you know, how can this happen, what is going on, you know, with me being
pregnant and me defending myself from being attacked, so that’s mainly what it
was.  And then [D.H.], he was cheating on me.

She
testified that she now has her father and friends to support her when she needs
it, even with paying bills.  She said that Mr. D. was her boyfriend but that
she had not seen him since September 2010.

Mother
testified that she wants D.H. to have her children if she cannot have them but
that she wants them back.  She said that the children should be returned to her
because she has never abused them, loves them, makes sure they get their
education, takes care of them, and has a bond with them.

Mother
testified that L.L.F. is doing structured activities every day at the RTC,
receiving counseling, and going to school.  She said that they are “help[ing]
her be calm at what she does, because she has an attitude.”  However, Mother
testified that L.L.F. did not start acting out until she was removed the second
time, that she started withdrawing, and that she missed Mother.  Mother
testified that the children had structure when they lived with her.

Finally,
Mother testified that she was arrested the day before trial began because she
had missed a criminal court date while she was in Brownwood for a visitation
with L.L.F., who she had not seen in two months.  Mother testified that the
issue had been resolved, and she expected to be released the day of her
testimony because she had pleaded guilty and had been sentenced to community
service and time served.

Dr.
Parnell Ryan, a psychologist, conducted a psychological assessment of Mother in
October 2007.  In his assessment, Dr. Ryan noted that Mother admitted attempting
suicide.  She denied having auditory hallucinations, but she told Dr. Ryan that
she had been diagnosed with ADHD, depression, bipolar disorder, and an anxiety
disorder and that she was not taking medication at the time.  Mother said that
she had overdosed at age thirteen and had been prescribed psychotropic
medication from age fifteen forward.  Mother also informed Dr. Ryan of past physical
altercations between her and the father of two of her children.  Mother
admitted past drug use, specifically marijuana, and said she had two convictions
for assaultive offenses.

Dr.
Ryan testified that, on the Kaufman Brief Intelligence Test, Mother scored in
the borderline range of intellectual functioning.  She demonstrated
elementary-school-level comprehension on each element of an academic
functioning test.  For Mother’s emotional functioning, Dr. Ryan testified that
his diagnostic impressions were that Mother has a bipolar disorder and cannibas
dependence.  Dr. Ryan also testified that Mother has “Personality Disorder Not
Otherwise Specified,” which means that she has “antisocial dependent traits”
that could become a “full-blown” personality disorder if she did not take the
time to treat herself.  Dr. Ryan testified that Mother’s disorders are
treatable but that they require honesty and “a great deal of work.”  When asked
to give his outlook for Mother after being informed that she had continued to
not take her medication and to have anger and explosive behaviors two and
one-half years later, Dr. Ryan testified that his prognosis would change from
“favorably-guarded” to “poor.”

Dr.
Amy Fisher-Smith, a licensed clinical psychologist, conducted a psychological
evaluation of Mother in June 2010.  She asked Mother to complete a personality
assessment and a parental stress index, and she obtained a family and social
history.  Dr. Fisher-Smith testified that she noticed that Mother’s emotions
were “kind of all over the place.  She would have crying spells and then she
would have a more stable mood and then she would become irritable, and then
maybe a little euphoric.”  Mother said to her, “I hate myself.  What did I do? 
All I want is love, and I can’t get it from nobody.  I hate men, and I like
being alone.”

Dr.
Fisher-Smith testified that she assessed Mother as having Bipolar One Disorder
and Post-Traumatic Stress Disorder, and she included a rule-out diagnosis of
Generalized Anxiety Disorder.  Dr. Fisher-Smith also testified that she
assessed Mother with having borderline personality disorder and a need to rule
out antisocial personality disorder.  She testified that Mother’s bipolar
disorder can be managed with medication and therapy and that although there are
treatments for antisocial disorder that can be effective, treatment is more
complicated.  Dr. Fisher-Smith explained that Mother’s case is particularly
complex because she has both bipolar and antisocial diagnoses, which makes
treatment more difficult.

Dr.
Fisher-Smith described Mother as mildly- to moderately-impaired in terms of
making parental decisions, and she testified that the failure to follow and
receive treatment puts Mother more on the moderate end of parental impairment.  She
testified that parenting five children would be inherently more difficult for
anyone but especially so for Mother and that Mother definitely cannot parent
during depressive episodes.  Dr. Fisher-Smith testified that the future
prognosis for a person with a bipolar condition depends on what the person has
or has not proven they can or will do for medication management and therapeutic
intervention.

III. 
Standards of Review

A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is
imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In
re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanently—to divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child’s right to inherit.  Tex.
Fam. Code Ann. § 161.206(b) (West 2008); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and
strictly construe involuntary termination statutes in favor of the parent.  Holick,
685 S.W.2d at 20–21; In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort
Worth 2009, no pet.).

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (West Supp.
2011); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact.  Tex. Dep’t of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34 S.W.3d 625,
629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001; see also id. § 161.206(a) (West 2008).  Evidence is
clear and convincing if it “will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established.”  Id. § 101.007 (West 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002); see In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007)
(contrasting standards for termination and modification).

In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.  Id.

We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not
unreasonable.  Id. at 573.

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our own.  In
re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that the parent violated the relevant conduct provision of section 161.001(1)
and that the termination of the parent-child relationship would be in the best
interest of the child.  Tex. Fam. Code Ann. § 161.001; C.H., 89
S.W.3d at 28.  If, in light of the entire record, the disputed evidence that a
reasonable factfinder could not have credited in favor of the finding is so
significant that a factfinder could not reasonably have formed a firm belief or
conviction in the truth of its finding, then the evidence is factually insufficient. 
H.R.M., 209 S.W.3d at 108.

IV. 
Statutory Endangerment

Mother
argues in her first and second issues that the evidence is
legally
and factually
insufficient to support the trial court’s section 161.001(1)(D) and (E)
findings.

A. 
Applicable Law

“Endanger”
means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at
533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no
pet.).  Under section 161.001(1)(D), it is necessary to examine evidence
related to the environment of the children to determine if the environment was
the source of endangerment to the children’s physical or emotional well-being.  J.T.G.,
121 S.W.3d at 125.  Conduct of a parent in the home can create an environment
that endangers the physical and emotional well-being of a child.  In re W.S.,
899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ).  For example, abusive
or violent conduct by a parent or other resident of a child’s home may produce
an environment that endangers the physical or emotional well-being of a child.  See
id. at 776–77; Ziegler v. Tarrant Cnty. Child Welfare Unit, 680
S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref’d n.r.e.).  Parental and
caregiver illegal drug use and drug-related criminal activity likewise support
the conclusion that the children’s surroundings endanger their physical or
emotional well-being.  See In re S.D., 980 S.W.2d 758, 763 (Tex.
App.—San Antonio 1998, pet. denied).

Under
section 161.001(1)(E), the relevant inquiry is whether evidence exists that the
endangerment of the children’s physical well-being was the direct result of the
parent’s conduct, including acts, omissions, or failures to act.  See J.T.G.,
121 S.W.3d at 125; see also Tex. Fam. Code Ann. § 161.001(1)(E).  Additionally,
termination under (E) must be based on more than a single act or omission; the
statute requires a voluntary, deliberate, and conscious course of conduct by
the parent.  J.T.G., 121 S.W.3d at 125; see Tex. Fam. Code Ann. § 161.001(1)(E).
 It is not necessary, however, that the parent’s conduct be directed at the
children or that the children actually suffer injury.  Boyd, 727 S.W.2d
at 533; J.T.G., 121 S.W.3d at 125.  The specific danger to the children’s
well-being may be inferred from parental misconduct standing alone.  Boyd,
727 S.W.2d at 533; In re R.W., 129 S.W.3d 732, 738 (Tex. App.—Fort Worth
2004, pet. denied).

“To
determine whether termination is necessary, courts may look to parental conduct
occurring both before and after the child’s birth.”  In re M.E.-M.N.,
342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied) (citing In re
D.M., 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.)).  A parent’s
mental state may be considered in determining whether a child is endangered if
that mental state allows the parent to engage in conduct that jeopardizes the
physical or emotional well-being of the child.  In re J.I.T.P., 99
S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); In re C.D.,
664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ).  Further, threats or
attempts to commit suicide may also contribute to a finding that the parent
engaged in a course of conduct that is detrimental to a child’s physical or
emotional well-being.  See In re A.M.C., 2 S.W.3d 707, 716 (Tex. App.—Waco
1999, no pet.).

B. 
Discussion

Mother
argues that there is insufficient evidence that any of her conduct impacted the
children.  Concerning her failure to take medication, Mother argues that she
was pregnant during one period in which she did not take medication, that she
was otherwise unable to maintain her medication because of lapses in her
Medicaid and Medicare coverage, and that she therefore attempted to “stretch”
her medication to make it last longer.  She argues that there is no link
between her cluttered home and any endangerment to the children, and she points
to conflicting evidence about the alleged bleach incident and her angry
outbursts.  Mother also argues that although the Department relies on evidence
concerning her aggressive and volatile behavior to support the trial court’s
endangerment findings, the Department did not remove the children from her care
when the incidents allegedly happened.  Finally, Mother argues that she made
“great efforts” to comply with her service plan.

The
Department responds that there is ample evidence that Mother endangered the
children, and it points to evidence that Mother took pills and asked L.L.F. to
help her commit suicide, that Mother refused to take her bipolar medication,
that living with Mother (given her largely untreated mental illness) was
chaotic and like torture, that Mother used marijuana during her two most recent
pregnancies, that Mother used marijuana in the home where the children lived,
that Mother’s relationships involved domestic violence, and that Mother did not
complete her service plan.

This
court has held that a parent’s failure to take medication can create an
environment or expose a child to an environment that endangers the child’s
emotional or physical well-being.  See In re M.A.P., No. 02-11-00484-CV,
2012 WL 2036457, at *10 (Tex. App.—Fort Worth June 7, 2012, no pet. h.) (mem.
op.) (holding the mother’s failure to take medication for schizophrenia after
birth of child given the mother’s past conduct without medication was
sufficient for trial court to conclude that the mother endangered the child); see
also In re K.G., 350 S.W.3d 338, 355 (Tex. App.—Fort Worth 2011, pet.
denied) (“[T]he trial court could have chosen to believe that Mother’s . . .
failure to . . . take steps to treat her mental health issues demonstrated an
inability to provide [the child] with a safe environment.”); In re O.E.W.-K.,
No. 02-10-00199-CV, 2011 WL 1225470, at *28 (Tex. App.—Fort Worth Mar. 31,
2011, no pet.) (mem. op.) (citing Sawyer v. Tex. Dep’t of Protective
& Regulatory Servs., No. 03-02-00286-CV, 2003 WL 549216, at *8 (Tex. App.—Austin
Feb. 27, 2003, no pet.) (mem. op.) (stating that the appellant’s refusal of
treatment for her mental illness endangered her children)).

In
addition to the evidence concerning Mother’s failure to take her bipolar
medication, the trial court heard testimony concerning Mother’s guarded
long-term prognosis without medication, drug use while pregnant, drug use in
the home, aggressive behavior, and criminal convictions.  While the evidence is
in many respects conflicting, the trial court is the sole judge of the
credibility of the witnesses and the weight to be given to their testimony.  See
In re C.S.L.E.H., No. 02-10-00475-CV, 2011 WL 3795226, at *5 (Tex.
App.—Fort Worth Aug. 25, 2011, no pet.) (mem. op.); see also In re T.N.,
180 S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.) (“[T]he fact finder,
as opposed to the reviewing body, enjoys the right to resolve credibility
issues and conflicts within the evidence.  It may freely choose to believe all,
part, or none of the testimony espoused by any particular witness.”).

Applying
the appropriate standards of review, we hold that the evidence is legally and
factually sufficient to support the trial court’s findings that Mother engaged
in conduct or knowingly placed the children with persons who had engaged in
conduct that endangered the physical or emotional well-being of the children
and knowingly placed or knowingly allowed the children to remain in conditions or
surroundings that endangered their physical or emotional well-being.  See
Tex. Fam. Code Ann. § 161.001(1)(D), (E); see also H.R.M., 209 S.W.3d at
108; J.P.B., 180 S.W.3d at 573. 
We thus overrule Mother’s first and second issues.[12]

V. 
Best Interest

Mother
argues in her fourth issue that the evidence is factually
insufficient to support the trial court’s finding that termination of her
parental rights is in the children’s best interest.  See Tex. Fam. Code
Ann. § 161.001(2) (requiring clear and convincing evidence “that termination is
in the best interest of the child”).

A. 
Applicable Law

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  Nonexclusive factors that the trier of fact in a termination case may
use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical
needs of the child now and in the future;

(C)     the emotional and physical
danger to the child now and in the future;

(D)     the parental abilities of
the individuals seeking custody; 

(E)     the programs available to
assist these individuals to promote the best interest of the child;

(F)     the plans for the child by
these individuals or by the agency seeking custody;

(G)     the stability of the home
or proposed placement;

(H)     the acts or omissions of
the parent which may indicate that the existing parent-child relationship is
not a proper one; and

(I)      any excuse for the acts or
omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations
omitted).  These factors are not exhaustive; some listed factors may be
inapplicable to some cases; other factors not on the list may also be
considered when appropriate.  C.H., 89 S.W.3d at 27.  Furthermore,
undisputed evidence of just one factor may be sufficient in a particular case
to support a finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each factor will
not support such a finding.  Id.

B. 
Discussion

The
evidence is discussed in detail above, and we do not repeat it here.  Applying
the Holley factors, we note that Mother regularly attended visitations,
that Mother and the children interacted well during visitations, and that
Mother feels bonded to the children.  The four youngest children are doing well
in foster care, but L.L.F. is in an RTC because of her behavior.  Mother
testified that L.L.F. did not act out in her home, but T.L.F. and A.A.H. are
both in counseling for acting out sexually.  T.L.F. had also reported that
“she’s always seen people yelling.”  D.H. testified that Mother is a good
mother, but he also testified that she needs help, that he does not want his
daughters A.A.H. and N.C.H. to experience the difficulties that Mother’s older
children experienced while living with Mother, and that it is not a good idea
for the court to return the children to her.  The trial court heard evidence
that Mother attempted suicide, that she is hostile and aggressive without her
medication, and that she does not believe she needs her medication and has not
taken advantage of the medication management offered through MHMR.  Mother also
used marijuana during two pregnancies and in the home and failed to complete
her service plan.

Applying
the appropriate standard of review, we hold that the evidence is factually
sufficient to support the trial court’s best interest finding.  See H.R.M.,
209 S.W.3d at 108; see also In re S.A.G., No. 02-09-00125-CV, 2010 WL
1006301, at *9 (Tex. App.—Fort Worth Mar. 18, 2010, no pet.) (mem. op)
(discussing mother’s mental health issues in best interest context); In re
K.W., No. 02-08-00162-CV, 2009 WL 417913, at *6 (Tex. App.—Fort Worth Feb.
19, 2009, no pet.) (mem. op.) (“Despite Appellant’s bipolar diagnosis, she did
not take medication and had not sought treatment from a mental health expert.  This
evidence also tended to show a potential emotional and physical danger to the
children.”); In re E.A.W.S., No. 02-06-00031-CV, 2006 WL 3525367, at *11–12
(Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.) (holding that
mother’s “instances of mental instability and agitation, including threatening
behavior and suicidal ideation” supported termination); In re K.A.S.,
131 S.W.3d 215, 226 (Tex. App.—Fort Worth 2004, pet. denied) (discussing the
emotional and physical danger of the mother’s noncompliance in taking
medications for her bipolar disorder).  We thus overrule Mother’s fourth issue.

VI. 
Conclusion

Having
overruled Mother’s dispositive issues, we affirm the trial court’s judgment.

 

 

ANNE GARDNER

JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; GARDNER and GABRIEL, JJ.

 

DELIVERED:  July 19, 2012 








 









[1]See Tex. R. App. P. 47.4.





[2]See Tex. Fam. Code
Ann. § 161.001(1)(D), (E) (West Supp. 2011).





[3]See id. §
161.003 (West 2008).





[4]D.H. is A.A.H. and
N.C.H.’s biological father.





[5]Mother later told Gorry
that she forgot about the psychological evaluation and was out looking for a
job.





[6]However, Mother’s drug
tests near that time were negative.





[7]Mother told Gorry on
January 28, 2010, that D.H. had moved out again.





[8]Flores added that Mother
had not benefitted from the counseling sessions she had attended before being
discharged.





[9]On a March 29, 2011
document contained within Mother’s jail records, Mother answered that she does
not take medications.  Trial in this case began on March 30, 2011.





[10]The trial court denied
the Department’s request that D.H.’s parental rights to A.A.H. and N.C.H. be
terminated, finding that termination would not be in their best interest.





[11]The actual amount of each
monthly check is $604 per month because a premium is deducted monthly.  The
premium is later reimbursed.





[12]Because we have overruled
Mother’s first and second issues, we need not address her third issue.  See In
re E.M.N., 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.); see
also Tex. R. App. P. 47.1.